UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| In re: | Case No. 2:17-cv-01251-MMD |
| R&S ST. ROSE, LLC, | Member Cases:<br>2:17-cv-1298-MMD & 2:17-cv-1301-MMD |
| Debtor, | ORDER |
| | |
| BRANCH BANKING AND TRUST<br>COMPANY, | |
| Appellant, | |
| v. | |
| R & S ST. ROSE LENDERS, LLC; R & S<br>ST. ROSE, LLC; R & S INVESTMENT<br>GROUP, LLC; COMMONWEALTH LAND<br>TITLE INSURANCE COMPANY; THE<br>CREDITOR GROUP; and THE U.S.<br>TRUSTEE, | |
| Appellees. | |
| AND RELATED APPEALS | |

## I.    SUMMARY

This is a consolidated appeal of *Branch Banking and Tr. Co. v. R&S St. Rose*

*Lenders, LLC, et al.* case numbers 2:17-cv-01251-MMD and 2:17-cv-1298-MMD, and of

*Commonwealth Land Title Ins. Co. v. R&S St. Rose Lenders, LLC, et al.*, case number

2:17-cv-1301-MMD. These cases where consolidated because all three appeals stem

from the bankruptcy case filed by R&S St. Rose, LLC ("Rose") (bankruptcy case no. 11-

14974-MKN) ("Rose Bankruptcy Case") and related adversary proceeding (adversary

proceeding no. 13-01822) ("Adv. Pro."). Appellants Branch Banking and Trust Company

("BB&T") and Commonwealth Land Title Insurance Company ("Commonwealth")

1  specifically appeal the Bankruptcy Court's order overruling BB&T's Objection to R&S St.

2  Rose Lenders' ("Lenders") proof of claim (ECF No. 64 at 6–7 ("Order")). (*See* ECF No. 62

3  (Appellant's joint status report); ECF No. 73 at 222; ECF No. 64 at 36.) BB&T separately

4  appeals from the Bankruptcy Court's Memorandum Decision/Judgment ("Judgment") in

5  the Adv. Pro. which determined the amount of Lenders' claim filed against Rose. (ECF

6  No. 73 186–89*; ECF No. 64 at 6–34).[1] This Court affirms both the Order and Judgment.

## II.   BACKGROUND

### A.   Factual History

Rose and Lenders were both formed in 2005. Each had the same members: Forouzan, Inc., and RPN LLC, which were respectively owned by Saiid Forouzan Rad and R. Phillip Nourafchan.[2] (ECF No. 65 at 36–37.) Rose was established to land-bank real property in Henderson, Nevada ("Property") with the intent of selling the Property to Centex Homes ("Centex"). (ECF No. 87 at 89–91.) Lenders was formed for the purpose of borrowing funds from individual lenders and then loaning those same funds to Rose. (*Id.* at 21.)

Rose purchased the Property for over $45 million and granted Centex a one-year option for over $54 million. (*Id.* at 92, 242–48.) To finance the purchase of the Property, Rose obtained funds from three separate sources: (1) about $29 million from Colonial Bank ("Colonial") ("Acquisition Loan") secured by a first-position deed of trust on the Property; (2) about $8 million non-refundable deposit from Centex; and (3) over $12 million comprised of money from individual lenders, with a promissory note in favor of Lenders for that amount ("Lenders' Promissory Note") secured by a second-position deed of trust on the Property ("Lenders' DOT"). (*Id.* at 96; ECF No. 81 at 71–72 (St. Ct. Findings of Fact).) The individual lenders from whom Lenders borrowed money included Robert

///

///

---

[1]The briefings in each matter are substantively the same. Commonwealth was not a party to the underlying Adv. Pro. (ECF No. 62.)

[2]Rad passed away on June 1, 2015. (ECF No. 65 at 111.)

1  Murdock and Eckley Keach (hereinafter, "Murdock & Keach"). (ECF No. 81 at 74 (St. Ct.

2  Findings of Fact).) The individual lenders received promissory notes from Lenders. (*Id.*)

3      Centex declined to exercise its option to purchase the Property, thereby forfeiting

4  its deposit. (*Id.* at 75.) Several months later—March 2007, in order to avoid foreclosure

5  Rose and Colonial modified the first-position deed of trust to extend the date of maturity.

6  (*Id.*) As part of that modification, Colonial requested and received a subordination

7  agreement from Rose. (*Id.*)

8      It is undisputed that by the summer of 2007, some of the individual investors ("first-

9  in-time lenders") sought repayment of their principal. (ECF No. 86 at 13.) Lenders

10 borrowed money from other individual lenders ("later-in-time lenders") to pay back some

11 of the earlier loans. (*E.g.*, ECF No. 93 at 217–18; ECF No. 90 at 86–103; ECF No. 83 at

12 15–166.) Later, Rose obtained a *second* loan from Colonial for approximately $43 million,

13 part of which was used to pay off the Acquisition Loan and separately to develop the

14 Property ("Construction Loan"). (ECF No. 81 at 80 (St. Ct. Findings of Fact).) The

15 Construction Loan was secured by a new deed of trust on the Property ("Colonial's DOT").

16 (*Id.*). However, because Lenders' DOT was not reconveyed at the closing on the

17 Construction Loan, Colonial's DOT was placed in second position on the Property behind

18 Lenders' DOT. (*Id.* at 81–84.) Lenders was neither a party nor a guarantor in the

19 Construction Loan transaction. (*Id.* at 80.)[3] Almost a year after the Construction Loan

20 closed the title company asked Lenders to reconvey Lenders' DOT after confirming that

21 Lenders' DOT's priority over Colonial's DOT, but Lenders refused. (*Id.* at 85.)

22     Rose defaulted on both Lenders' Promissory Note and the Construction Loan and

23 both Lender and Colonial moved to foreclose on the Property. (*Id.*) Lenders also defaulted

24 on its loans with the individual lenders and stopped paying monthly interest. (ECF No. 88

25 at 28–29, 31–32.)

26 ///

27 ///

_____

28     [3]Rad and Nourafchan personally guaranteed the Construction Loan. (ECF No. 81 at 80 (St. Ct. Findings of Fact).)

3

### B. Procedural History

#### 1. State Court Action

Murdock & Keach filed suit against Rad, Norafchan, Rose and Lenders, but later elected to sue only Lenders for breach of their promissory notes. (*E.g.*, *id.* at 27; ECF No. ECF No. 96 at 15–22.) In July 2009, Colonial filed suit in state court alleging that Colonial's DOT, securing the Construction Loan, had priority over Lenders' DOT, securing Lenders' Promissory Note. (ECF No. 70 at 67.) Colonial's suit was filed against Rad, Norafchan, Rose and Lenders, and consolidated with the Murdock & Keach suit. (*Id.* at 65; ECF No. 81 at 88.)

In the meantime, in August 2009, the Federal Deposit Insurance Corporation ("FDIC") placed Colonial into receivership. (ECF No. 81 at 85.) On August 14, 2009, BB&T entered into a Purchase and Assumption Agreement with the FDIC ("PAA") which purported to transfer Colonial's assets to BB&T. (*Id.* at 86.) Thereafter, BB&T filed a second amended complaint ("SAC") in the state court action. (*Id.* at 66–67.) In its SAC, BB&T asserted six claims—all relating to whether Colonial's DOT had priority over the Lenders' DOT. (*Id.* at 67; ECF No. 71 at 8–23.) These claims are: (1) declaratory relief—contractual subrogation; (2) declaratory relief/quiet title—replacement; (3) equitable/promissory estoppel; (4) unjust enrichment; (5) fraudulent misrepresentation; and (6) civil conspiracy. (ECF No. 71 at 8–23.) The SAC questioned whether Lenders "paid any consideration" to Rose for Lenders' DOT. (*Id.* at 12.) Lenders filed a counterclaim contending that Lenders' DOT had priority over Colonial's DOT. (ECF No. 71 at 238.)

The state trial court granted summary judgment in favor of Murdock & Keach on their claims for breach of their promissory notes. (ECF No. 96 at 15–20.) It held a bench trial regarding the priority of the competing liens based on BB&T's first four claims, but the parties agreed to delay consideration of the fraudulent misrepresentation and civil conspiracy claims. (ECF No. 71 at 229.) BB&T produced the PAA in an attempt to show that it owned the note and Colonial's DOT related to the Construction Loan. (*Id.* at 238; ECF No. 81 at 68.) During the trial, the court explained that the PAA was insufficient to

4

establish BB&T's ownership of the note and Colonial's DOT and directed BB&T to return the following day with additional evidence. (ECF No. 81 at 68–69.) BB&T delivered two new documents: (1) a November 2009 assignment; and (2) an executed—but unrecorded—assignment. (*Id.* at 69.) The trial court excluded both documents because they were not disclosed during discovery and also denied BB&T's motion to substitute in its place the FDIC or Colonial Bank (*Id.*).

The state trial court ultimately found that BB&T had not met its *evidentiary burden* of proving it received an assignment of Colonial's DOT:

> BB& . . . relied upon the language of the Purchase and Assumption Agreement, and no other admissible evidence, documentary or testimonial. The court hereby finds that [ ] the Purchase and Assumption Agreement was not sufficient evidence, on its face, to establish that BB&T was assigned the 2007 Colonial Bank Deed of Trust.

(*Id.* at 70–71.) The court took issue to note that its decision was not based on standing grounds. (*Id.* at 70 ("Although BB&T repeatedly attempted to couch the issue as one of standing, it is not a standing issue. Rather, the defect which prompts the dismissal of BB&T's claims is evidentiary.").) The trial court found that the PAA "did not clearly transfer the loan, note and deed of trust at issue" and that it was "internally inconsistent and incomplete, and prevents the Court from making a finding as to whether an assignment of the loan at issue occurred." (*Id.* at 68, 87.) This was partly because the PAA referred to attached schedules but no such schedules existed and also excluded certain assets from the sale. (*Id.* at 86–87.) Based on these findings, the trial court concluded that BB&T "has not shown it has the ability to assert the claims . . . filed by Colonial Bank." (*Id.* at 89.) The court then held that Lenders' DOT was in first priority position. (*Id.* at 91.)

BB&T then filed a motion to voluntarily dismiss its fraudulent misrepresentation and civil conspiracy claims, which the trial court granted, so BB&T could appeal its decision as a final order. (ECF No. 71 at 229.) On appeal, the Nevada Supreme Court affirmed the trial court's decision in its entirety (ECF No. 82 at 25). *R&S St. Rose Lenders, LLC v. Branch Banking and Trust Co. et al.*, No. 56640, 2013 WL 3357064 (Nev. May 31, 2013). The state supreme court further denied rehearing *en banc* in February 2014. *R&S St. Rose*

*Lenders, LLC v. Branch Banking and Trust Co. et al.*, No. 56640, Order Denying en banc Reconsideration (Nev. Feb. 21, 2014). (ECF No. 82 at 33–46.) BB&T also filed a petition for a writ of certiorari to the United States Supreme Court which was denied. *Branch Banking and Trust Co. v. R&S St. Rose Lenders, LLC*, 135 S. Ct. 85 (Mem.) (2014).

### 2.     Relevant Bankruptcy Court Proceedings and Appeals

In 2011, while BB&T's appeal was pending before the Nevada Supreme Court, Rose and Lenders each filed Chapter 11 bankruptcies. (ECF No. 82 at 148.)

### a.     Lenders' Proof of Claim in Rose's Bankruptcy Case

Lenders filed a proof of claim—Claim No. 12-1 ("POC 12")—in the Rose Bankruptcy Case, claiming a total of $27,460,871, with $12,000,000 claimed as secured and $15,460,871 claimed as unsecured. (ECF No. 82 at 48–52; ECF No. 96 at 177.) BB&T filed an objection ("Objection"), challenging POC 12 on two bases: "(1) Lenders did not provide [Rose] . . . any money and (2) even if Lenders could show that it provided money to [Rose] . . . the amount of Lenders' claim is inflated." (ECF No. 71 at 106; ECF No. 82 at 106.) Lenders responded, arguing that the Objection should fail "because (1) the state court had already litigated the amount of the claim . . . and (2) BB&T failed to rebut the prima facie validity of [POC 12]." (ECF No. 71 at 140 (Judge James C. Mahan's Order).) After full briefing BB&T's Objection was taken under advisement on December 11, 2013. (ECF No. 71 at 135.)

The Bankruptcy Court subsequently overruled BB&T's Objection to POC 12. (*Id.* at 140.) The court held that "BB&T may not relitigate that Lenders loaned $12,300,000[4] to [Rose] in September 2005 as evidenced by the promissory note attached to the Lenders POC," because "[t]hat factual and legal issue was determined by the [s]tate [c]ourt and affirmed by the Nevada Supreme Court." (*Id.* at 136.) However, the court also concluded that BB&T could challenge any additional principal advances or calculation of interest. (*Id.*) The Bankruptcy Court additionally found that BB&T did not produce sufficient evidence to

///

---

[4]The promissory note actually reflects an amount of $12,000,000. (*E.g.*, ECF No. 82 at 50.)

overcome the prima facie validity of POC 12. (*Id.*) BB&T appealed that decision to this Court; Judge James C. Mahan presided over that appeal and issued a decision on October 1, 2014. (ECF No. 71 at 138–45.)

In that appeal, Judge Mahan concluded that the state court "decided . . . issues of lien priority and assignment" but that the "issue of the *amount* of [Lenders' POC 12] was not necessarily litigated in the state court action" and thus the Bankruptcy Court should have allowed the amount to be litigated. (*Id.* at 144 (emphasis added).) However, Judge Mahan affirmed the Bankruptcy Court's ruling as to the prima facie validity of POC 12, despite BB&T's contention that Lenders needed to present extrinsic evidence of Lenders' Promissory Note "to prove that actual consideration was paid." (*Id.* at 144–45.) Judge Mahan then remanded the case for further proceedings consistent with his opinion. (*Id.* at 145.) Lenders appealed and that appeal was dismissed for lack of jurisdiction because the matter was not final. (*Id.* at 223–25.) Specifically, the Ninth Circuit noted that Judge Mahan's "order opens the door to further factfinding and litigation surrounding the amount of Lenders' proof of claim." (*Id.* at 225.)

Before Judge Mahan's order, an order was entered in the Rose Bankruptcy Case confirming Rose's liquidation plan and approving the sale of the Property. (ECF No. 96 at 178.) BB&T and Commonwealth appealed confirmation of the Rose plan to this Court, but the order was affirmed both in this Court and on appeal before the Ninth Circuit. (*Id.* at 179.)

### b.    The Adv. Pro.

Concurrent with its Objection, BB&T filed the Adv. Pro. complaint, asserting seven claims to dispute the "validity, priority extent of lien, or other interest in the Property." (*Id.* at 106 n.2; ECF No. 96 at 95–108.) BB&T essentially asserts many of the same legal theories it litigated in the state court. (*See* ECF No. 96 at 95–108.) *Inter alia*, BB&T asked that the Bankruptcy Court declare that the 2007 Construction Loan took the first-position priority of the 2005 Acquisition Loan and that Lenders' Promissory Note and Lenders' DOT are invalid. (*Id.* at 107–08.) BB&T's request regarding invalidation (seventh claim) was

based on BB&T's contention that Lenders provided no consideration or money to Rose for either Lenders' Promissory Note or Lenders' DOT. (*Id.* at 107.) This contention was in gist the same as those underlying BB&T's Objection to POC 12. Lenders moved to dismiss the Adv. Pro. complaint. (ECF No. 71 at 135–36.) The Bankruptcy Court granted dismissal on all but the seventh claim seeking a determination of the amount of Lenders' POC 12. (ECF No. 73 at 198 at n.7.)

### c.    On Remand from Judge Mahan's Order

In an evidentiary hearing on remand from Judge Mahan's decision, Lenders moved in limine to preclude BB&T and Commonwealth from introducing testimony/evidence to dispute the "validity" of Lenders' Promissory Note. (ECF No. 96 at 179–80.) The motion specifically asked for the exclusion of testimony of BB&T and Commonwealth's two expert witnesses—Greg A. McKinnon and William T. Rogers. (*Id.* at 180.) Lenders argued that the law of the case, judicial estoppel, claim preclusion and issue preclusion all barred BB&T and Commonwealth from contesting the validity of Lenders' Promissory Note. (*Id.* at 180–81.)[5]

The Bankruptcy Court concluded that each asserted ground supported the relief Lenders requested, but particularly focused on the law of the case doctrine. (*Id.* at 181.) The Bankruptcy Court noted:

> The USDC's order remanding BB&T's objection to the Lenders POC limited the inquiry to the amount of Lenders' claim . . . This court's order on Lenders' motion to dismiss the BB&T Adversary specifically determined BB&T's seventh cause of action to be an objection as to the amount of Lenders' claim, and, more important, specifically barred BB&T from attempting to relitigate the issue of whether Lenders loaned funds to St. Rose in September 2005 . . . That funds were borrowed by St. Rose from Lenders has been determined in this case; the only question that remains is how much.

(*Id.*; *see also* ECF No. 73 at 11 (BB&T's counsel conceding that BB&T's Objection tracks the seventh claim in its adversary complaint).) BB&T and Commonwealth did not appeal the Bankruptcy Court's ruling on Lenders' motion in limine.

///

---

[5]The motion was granted in part (as to Rogers) and denied in part (as to McKinnon).

The Bankruptcy Court held a one-day trial concerning the amount of POC 12 and Lenders' plan confirmation. (ECF No. 73 at 7–172.) At the beginning of the trial, BB&T's counsel raised that the parties had an agreement that Thomas Neches (Lenders' expert) and Mckinnon (BB&T's expert) were qualified experts and the court confirmed the parties' stipulation. (*Id.* at 12.)

On April 24, 2017, the Bankruptcy Court issued its Memorandum Decision, containing extensive findings of facts and conclusions of law and considering the various decisions from this Court up to that point. (*Id.* at 195–218.)[6] The Bankruptcy Court noted that "[n]otwithstanding the [s]tate [c]ourt findings and conclusions, [it] independently examined the record presented to determine whether a balance is owed on the [Lenders' Promissory Note] and if so, the proper amount." (*Id.* at 205–06.) Among other things, the Bankruptcy Court found that evidence that Lenders loaned Rose money included the uncontradicted testimony of Nourafchan—despite the opportunity for cross-examination— that Lenders "advanced $10,300,000" to Rose to acquire the Property. (*Id.* at 208.) Ultimately, the Bankruptcy Court also agreed with Neches' calculation of the principal of Lenders' Promissory Note. (*Id.* at 214–18.) The court found that Lenders was owed a principal balance of $9,025,000 as of April 4, 2011, accrued interest of $3,325,660 and late fees in the amount of $476,250 for a total owed of $13,326,910, as of the Rose Bankruptcy Case filing. (*Id.* at 206.)

Thereafter, the Bankruptcy Court entered its Judgment in favor of Lenders in the Adv. Pro. based on BB&T's seventh claim for relief and dismissing the remaining claims and incorporating its finding from the Memorandum Decision that $13,326,910 is due on Lenders' Promissory Note as of April 4, 2011. (ECF No. 73 at 192–93.) The court likewise entered its Order as to BB&T's Objection to POC 12, overruling the Objection except as otherwise provided—that the amount owed by Rose to Lenders (on the note as secured by Lenders' DOT) is as noted. (*Id.* at 226–27.)

///

---

[6]Those decisions are noted *infra*.

BB&T and Commonwealth appealed the Bankruptcy Court's Order regarding the Objection. (*Id.* at 222; ECF No. 64 at 36.) BB&T separately appealed the Bankruptcy Court's Judgment in the Adv. Pro. (ECF No. 73 at 186–89.) The appeals are timely, and this Court has jurisdiction over the matter under 28 U.S.C. § 158(a)(1).

## III.    ISSUES PRESENTED

Two umbrella issues are presented in these consolidated appeals: (1) whether the Bankruptcy Court erred in finding that Lenders funded Lenders' Promissory Note;[7] and/or (2) erred in finding the balance owed on Lenders' Promissory Note. As to the second issue—of the amount owed—the following sub-issues are presented whether the Bankruptcy Court erred in (a) relying on Neches' expert testimony; or (b) its consideration of the noted "substitute lenders/loans"—and by extension allowing for recovery by substitute lenders. The latter sub-issue goes to BB&T's contention that Lenders engaged in a "Ponzi scheme."

## IV.    LEGAL STANDARD

On appeal "the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

A bankruptcy court's conclusions of law are reviewed de novo, "including its interpretation of the Bankruptcy Code," and its factual findings are reviewed for clear error. *In re Rains*, 428 F.3d 893, 900 (9th Cir. 2005); *In re Salazar,* 430 F.3d 992, 994 (9th Cir. 2005). The bankruptcy court's factual findings are clearly erroneous only if the findings "leave the definite and firm conviction" that the bankruptcy court made a mistake. *In re Rains*, 428 F.3d at 900. "A bankruptcy court abuses its discretion if it applies the law incorrectly or if it rests its decision on a clearly erroneous finding of a material fact." *In re Brotby*, 303 B.R. 177, 184 (B.A.P. 9th Cir. 2003); *see also In re Plyam*, 530 B.R. 456, 461

///

---

[7]Although BB&T and Commonwealth phrase the issue as whether the Bankruptcy Court erred in overruling the Objection to Lenders' POC 12, the first part of the Objection essentially challenged whether Lenders funded Lenders' Promissory Note. (ECF No. 71 at 106 ("(1) Lenders did not provide [Rose] . . . any money").)

(B.A.P. 9th Cir. 2015) ("A bankruptcy court abuses its discretion if it applies the wrong legal standard, misapplies the correct legal standard, or if its factual findings are illogical, implausible, or without support in inferences that may be drawn from the facts in the record.").

In reviewing a bankruptcy court's decision, this Court ignores harmless errors. *In re Mbunda*, 484 B.R. 344, 355 (B.A.P. 9th Cir. 2012). The Court may affirm the Bankruptcy Court's decision "on any ground fairly supported by the record." *In re Warren*, 568 F.3d 1113, 1116 (9th Cir. 2009) (citation omitted). In addition, the Court need not address arguments not raised in the trial court but "may do so to (1) prevent a miscarriage of justice or to preserve the integrity of the judicial process, (2) when a change of law during the pendency of the appeal raises a new issue, or (3) when the issue is purely one of law." *In re Lakhany*, 538 B.R. 555, 560 (B.A.P. 9th Cir. 2015).

## V.    DISCUSSION

### A.    Whether Lenders Funded Lenders' Promissory Note

The Court first addresses BB&T and Commonwealth's argument that the Bankruptcy Court erred in finding that Lenders funded Lenders' Promissory Note.[8] This

///

---

[8]BB&T and Commonwealth's arguments are disguised in the cloak that they are only challenging the amount of Lenders' Promissory Note. But many of their arguments go straight to the validity of Lenders' Promissory Note and whether Lenders funded that Note. (*E.g.*, ECF No. 63 at 17 (contending that an illusion was created that "Lenders was a functioning entity and that the Lenders Note was actually funded); *id.* at 25 (contending that issue preclusion is inapplicable because in the state court, "the issue of whether Lenders actually funded the Lenders Note was inessential to the state court's dismissals based on standing"); *id.* ("The Bankruptcy [Court] erroneously concluded that Lenders funded the Lenders Note, and compounded the error by including in the purported balance those funds that were advanced by later-in-time Individual Investors whose funds were used to pay earlier-in-time investors."); *id.* at 29 ("Judge Nakagawa's attempt to use issue preclusion to establish that Lenders actually funded the Lenders Note does not withstand scrutiny due to the lack of privity or a merits-based final judgment . . .."); *id.* (contending that the Nevada Supreme Court affirmed based on standing and "makes no mention of any factual findings related to whether Lenders funded the Lenders Note"); *id.* at 31 (again arguing that whether Lenders actually funded the Lenders Note was not necessarily litigated in the state court); *id.* at 34–37 ("The Bankruptcy Court's Finding That Lenders Note Was Funded is Clearly Erroneous"); *id.* at 37 ("The Bankruptcy Court was clearly erroneous in its finding that the expert testimony supported the determination that Lenders funded the Lenders Note.").) The Court will otherwise address the arguments relevant to

argument is largely grounded on BB&T and Commonwealth's contention that the Bankruptcy Court improperly gave preclusive effect to the state trial court's findings of fact and conclusions of law relevant to the issue. They rely on various decisions by this Court to support an apparent position that the state trial court's findings of facts and conclusions of law should not be given any preclusive effect.[9] (*E.g.*, ECF No. 63 at 23–25.) Lenders argues that issue preclusion, claim preclusion, law of the case and equitable estoppel prevented the Bankruptcy Court from reconsidering the validity (or funding) of Lenders' Promissory Note. (*E.g.*, ECF No. 86 at 32–33.) The Court applies the law of the case and does not further analyze the requirements of res judicata—issue and claim preclusion, or judicial estoppel.

The "law of the case" doctrine precludes a court from "reconsidering an issue that has already been decided by the same court . . . in the identical case." *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). However, the Court has "discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change

///

---

the amount of Lenders' Promissory Note—which materially focuses on the Bankruptcy Court's reliance on Neches' testimony and consideration of the "substitute loans/lenders".

[9]In addition to Judge Mahan's decision discussed *supra* and *infra*, those decisions are: *In re R & S St. Rose, LLC*, Nos. 2:12–cv–01615–LDG-GWF, 2:12–cv–01617–LDG GWF, 2:12–cv–01647–LDG-GWF, 2:12–cv–01667–LDG-GWF, 2014 WL 1268807 (D. Nev. Mar. 2014) (Judge Lloyd D. George) (concerning consolidation of the separate Rose and Lenders bankruptcy cases); *Branch Banking and Trust Co. v. Creditor Grp.*, No. 2:14-cv-00926-GMN, 2015 WL 1470692 (D. Nev. Mar. 2015) (Judge Gloria Navarro) (concerning BB&T's proof of claim in Lenders' bankruptcy case and specifically discussing the two claims that BB&T voluntarily dismissed in the Rose Bankruptcy Case—finding that issue preclusion did not apply as to those two claims); and *Branch Banking and Trust Co. v. Rad, et al.*, No. 2:14-cv-01947-APG-PAL, 2015 WL 5664393 (D. Nev. Sep. 24, 2015) Judge Andrew P. Gordon (concerning BB&T's claim for breach of guaranty against Rad and Nourafchan).

BB&T and Commonwealth particularly rely on Judge Navarro's decision to argue herein that the state trial court decision was based on standing and therefore was not a decision on the merits to which preclusion may apply. However, the Ninth Circuit has concluded that the state trial court decision is an "evidentiary" ruling. *In re R&S St. Rose Lenders, LLC*, 748 F. App'x 753, 759 n.3 (9th Cir. 2018) ("This interpretation accords with *Branch Banking Trust Co. v. D.M.S.I., LLC*, 871 F.3d 751, 760–61 (9th Cir. 2017), in which we stated that the same Nevada state court decisions were 'evidentiary' rulings that the materials BB&T submitted did not 'show assignment of a loan.'").

in law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result." *Id.* (citation omitted).

In light of Judge Mahan's October 1, 2014 order, this Court declines to reconsider whether Lenders actually funded Lenders' Promissory Note, even though the Bankruptcy Court took liberty to readdress the issue on remand.[10] Per Judge Mahan's order the only issue for the Bankruptcy Court to address on remand was the *amount* of Lenders' DOT. (ECF No. 71 at 144 ("[T]he court finds that the issue of the amount of R&S Lenders' proof of claim was not necessarily litigated in the state court action.").)[11] To be clear, Judge Mahan recognized that "the bankruptcy court overruled BB&T's objection to [Lenders' POC 12]." (*Id.* at 141.) Further, Judge Mahan affirmed the Bankruptcy Court's finding that BB&T had not offered sufficient evidence to overcome the prima facie validity of Lenders' POC 12. (*Id.* at 144.) Judge Mahan noted that "[t]he bankruptcy court considered BB&T's evidence attempting to refute the validity of the POC and rejected it." (*Id.* at 145.)

BB&T and Commonwealth relevantly argue that Judge Mahan's order does not prohibit a finding that the amount of Lenders' Promissory Note is zero and otherwise argue that the validity of the Note was not actually litigated in the state trial court. (ECF No. 59 at 13–14.) As to the latter point, Judge Mahan noted that the Bankruptcy Court took evidence on the validity issue—i.e., did not decide the issue solely based on preclusion. (ECF No. 71 at 144–45.) As to the amount of Lenders' Promissory Note, BB&T and Commonwealth acknowledge that "a finding that the amount of the Lenders Note is zero . . . intersect with issues of validity." (ECF No. 59 at 14.) Moreover, the Court disagrees with BB&T and Commonwealth that "nothing" in Judge Mahan's order precludes a finding that

///

---

[10](ECF No. 73 at 206–09 (the Bankruptcy Court readdressing the issue of whether Lenders' Promissory Note] was funded and concluding that the "uncontradicted record establishes that the [Lenders' Promissory Note] was funded by Lenders").)

[11]*See also* (ECF No. 71 at 224–25 (Ninth Circuit memorandum dismissing appeal from Judge Mahan's decision for lack of jurisdiction and stating that Judge Mahan's remand order opens the door to "further factfinding and litigation *surrounding the amount* of Lenders' proof of claim") (emphasis added).)

Lenders' Promissory Note is zero. (*Id.*) BB&T and Commonwealth are really asking this Court to ignore commonsense. As Lenders points out, an argument that the amount of Lenders' Promissory Note is zero "is another way of saying [Lenders' loan to Rose] is not supported by consideration." (ECF No. 86 at 28.) Commonsensically, that Lenders' POC 12 is established as valid requires the implicit finding that Lenders' Promissory Note as secured by Lenders' DOT was funded—i.e., supported by consideration or a sum of more than zero. This is also consistent with the state trial court and the Nevada Supreme Court's conclusions that Murdoch and Keach had valid and enforceable contracts with Lenders for monies they loaned Lenders. Again, Lenders' purpose was to obtain funds from individual lenders—including Murdoch and Keach—to fund the purchase of the Property. *See also* (ECF No. 73 at 207 (finding, *inter alia*, that "there is no dispute that funds received from individual lenders were used to purchase the Property" and that "[t]here is no dispute that all the individual lenders . . . received promissory notes from Lenders equal to the amount of their funds that were used to purchase the Property").)

This Court relies on Judge Mahan's decision as precluding further inquiry in this Court on the issue of whether Lenders' Promissory Note is valid/funded. The Court additionally notes that there is no contention by BB&T and Commonwealth—nor does this Court find—that Judge Mahan's decision is clearly erroneous, that there is intervening change in law, that the evidence on remand to the Bankruptcy Court was substantially different than before,[12] that other changed circumstances exist, or that manifest injustice would result if this Court considers Judge Mahan's decision as providing the law of this case. Accordingly, this Court finds that based on the law in this case, only the amount of Lenders' Promissory Note was at issue before the Bankruptcy Court on remand. Further, ///

---

[12]To the extent the evidence could be deemed "substantially different" on remand to the Bankruptcy Court, the evidence favors the conclusion that Lenders' Promissory Note was funded. On remand, the Bankruptcy Court noted that it relied on Nourafchan's "uncontradicted" testimony at the trial "that as of August 26, 2005, Lenders had advanced $10,300,000 to St. Rose to acquire the Property"). (ECF No. 73 at 208 (citing Second Nourafchan Declaration at ¶ 5).)

14

any contention that Lenders' Promissory Note is zero is inconsistent with Judge Mahan's decision affirming the validity of Lenders' POC 12.

The Court now turns to the issue of the amount—beginning with the premise that the amount of Lenders' Promissory Note is not zero.

**B.      Whether the Bankruptcy Court Erred in Its Finding of The Balance Owed on Lenders' Promissory Note**

As indicated, BB&T and Commonwealth raise two issues in challenging the Bankruptcy Court's finding of the amount owed on Lenders' Promissory Note (as distinct from their attempt to reargue the funding/validity issue). First, BB&T and Commonwealth argue that the Bankruptcy Court erred in admitting Neches' expert testimony and relying on his testimony in deciding the amount. (ECF No. 63 at 37–40; ECF No. 59 at 16–18.) Second, BB&T and Commonwealth maintain that "substitute loans" by later-in-time lenders should not have been considered in the overall amount of Lenders' Promissory Note. (ECF No. 63 at 37–45.) The Court addresses each in turn.

**1.      Admission of Neches' Testimony**

Lenders argues that BB&T and Commonwealth waived any objection to Neches' testimony by stipulating to Neches' qualifications as an expert and agreeing to admit Neches' expert report. (*E.g.*, ECF No 86 at 50; ECF No. 73 at 12 (stipulating to Neches' qualifications); *id.* at 14 (evidencing that the parties agree to the admission of all exhibits, which includes Neches' export report).) In their reply, BB&T and Commonwealth counterargue that because they objected to Neches' qualifications in their pre-trial motion in limine—which the Bankruptcy Court denied, their objections to Neches' testimony was sufficiently preserved and not waived. (*E.g.*, ECF No. 59 at 16–17.)[13] The Court accords with Lenders. *See, e.g.*, *Ohler v. United States*, 529 U.S. 753, 756 (2000) (concluding that ///

---

[13]BB&T and Commonwealth's cited decisions to support this position are inapposite to the facts of this case. *See* (ECF No. 59 at 16 (citing *United States v. Wells*, 879 F.3d 900, 917 (9th Cir. 2018), *United States v. Palmer*, 3 F.3d 300, 304 (9th Cir. 1993) and *Palmerin v. City of Riverside*, 794 F.2d 1409, 1413 (9th Cir. 1986)).) None of these cases involves an earlier objection followed by a later stipulation to admit the same evidence.

"a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted"); *see also Bowoto v. Chevron Corp.*, 621 F.3d 116, 1130 (9th Cir. 2010) ( quoting *Ohler*'s proposition).  BB&T and Commonwealth did not preserve their objection when they stipulated to Neches' qualifications and admission of his expert report after the adverse ruling on their motion in limine.

Further, even assuming the Bankruptcy Court erred in considering Neches' testimony, this Court finds that per their stipulations BB&T and Commonwealth invited the error and cannot now challenge the consideration of Neches' testimony on appeal. "Under the invited error doctrine, an error that is caused by the actions of the complaining party will cause reversal "only in the most exceptional situation." *U.S. v. Schaff*, 948 F.2d 501, 506 (9th Cir. 1991) (internal quotation and citations omitted). Such an "exceptional situation" exists where, for example, the complaining party has demonstrated that "reversal is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice." *Id.* (citation omitted). That is not the case here.

The Court additionally finds that the Bankruptcy Court did not abuse its discretion in otherwise relying on Neches' testimony. Here, BB&T and Commonwealth in gist argue that the Bankruptcy Court abused its discretion by failing to exclude Neches' testimony under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, (1993) and Federal Rule of Evidence 702. (ECF No. 59 at 17.) A court's role is to act as "'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (internal quotations and citations omitted). These standards are more relaxed in a bench trial situation where the judge serves as factfinder. *See, e.g.*, *Att'y Gen. of Ok. v. Tyson Foods, Inc.,* 565 F.3d 769, 779 (10th Cir. 2009) ("[W]hile *Daubert's* standards must still be met, the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting

///

///

a bench trial.").[14] In any event, "[i]f evidence lacks either reliability or relevance, it must be excluded." *Id.* at 943. There is no dispute the Neches' testimony regarding the balance owed on Lenders' Promissory Note was relevant, thus the Court solely considers reliability.

BB&T and Commonwealth contend that Neches' testimony is not reliable under *Daubert* because it is not based on established theory or technique—apparently based on a contention that Neches did not apply accounting principles. (ECF No. 59 at 17.) But again much of BB&T and Commonwealth's argument appear to go back to the issue of whether Lenders funded Lenders' Promissory Note—because Neches also testified on this point— (*id.* at 17–18). However, as this Court already concluded that issue is not up for relitigation. In any event, the Bankruptcy Court noted as follows:

> Both experts agree that, according to the accounting records, the individual lenders provided either $10,300,000 or $10,625,000 toward the purchase of the Property. Both experts agree that, according to the accounting records, the funds used to purchase the Property, the additional amounts subsequently received from the individual lenders, the principal payments made to the individual lenders, the loan fees paid to individual investors, and the interest payments made to individual investors, all relate to the promissory notes executed by Lenders in favor of the individual lenders. This accounting perspective is consistent with the court's prior conclusion that the St. Rose Note was funded by Lenders.

(ECF No. 73 at 214.) Given these findings, this Court cannot conclude that the Bankruptcy Court abused its discretion in considering Neches' testimony or finding it reliable. *See, e.g.*, *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ("[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable based on 'the particular circumstances of the particular case.'").

It appears that BB&T and Commonwealth's real issue is with where McKinnon and Neches differed—regarding whether additional funds were received from individual

///

///

_____

[14]*See also Deal v. Hamilton Cty. Bd. of Educ.,* 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir.1999) (recognizing that the jury "would likely be even less equipped than the judge to make reliability and relevance determinations and more likely than the judge to be awestruck by the expert's mystique").

lenders that substituted for the principal repayments made to other individuals (*see id.* at 215) which the Court discusses below.

## 2.  Inclusion of "Substitute Loans"

BB&T and Commonwealth argue that the Bankruptcy Court erroneously adopted Neches' opinion—while rejecting McKinnon's opinion—regarding whether "substitute funds" were properly included in calculating the amount owed on Lenders' Promissory Note. (ECF No. 63 at 40; ECF No. 59 at 18–19.) This Court cannot agree.

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Further, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

Here, the Bankruptcy Court noted that in his report Mckinnon "testified that there is no accounting basis to conclude that the additional loan proceeds substituted for the repayments of principal." (ECF No. 73 at 215.) Meanwhile, Neches concluded that "a substitution of lenders is shown by the time proximity between the repayment of principal to one individual lender and the receipt of additional loan proceeds from another individual lender." (*Id.* (citing Neches Report at 7).) The Bankruptcy Court also noted that Neches relied on Rad's previous percipient witness testimony that such substitutions occurred and notes that Rad was subject to cross-examination. (*Id.*) Considering that the parties stipulated to Neches as a qualified expert and Neches' method and reliance on Rad's testimony establishing that loans were substituted in for others, this Court cannot conclude that the Bankruptcy Court improperly relied on Neches' opinion.

BB&T and Commonwealth next claim that by including the "substitute funds" in the balance, the Bankruptcy Court improperly ignored Nevada law—NRS § 104.3101–.3605—concerning the proper method for transferring the right to payment under a

18

negotiable instrument. (ECF No. 63 at 42; ECF No. 59 at 19.) Relying on NRS § 104.3301, BB&T and Commonwealth specifically argue that Nevada law supports a conclusion that there must be documentation showing "an intent of one lender to replace another lender or an assignment of the earlier in time promissory note to the new 'substitute lender.'" Lenders responds that BB&T and Commonwealth effectively ask this Court to ignore the parties' intent. (ECF No. 86 at 54–55.)

The Court is unpersuaded by BB&T and Commonwealth's contention. The Court finds that NRS § 104.3301 ("Person entitled to enforce instrument") is not applicable here. As the Bankruptcy Court recognized, "[n]egotiation or transfer of the prior promissory notes was unnecessary . . . because there is no dispute that the subsequent individual lenders received separate notes from Lenders." (ECF No. 73 at 215 n.31.) In short, this is not a situation where one party is trying to enforce a note purportedly belonging to another. Moreover, the evidence presented at trial supports an intention to substitute prior loans with later loans. This evidence includes Rad's testimony about the substitutions and similar uncontradicted testimony by Nourafchan on remand. (ECF No. 73 at 216.) The Bankruptcy Court cites to Nourafchan's testimony "without contradiction that after [Rose] acquired the Property, Lenders received additional funds from individual lenders that 'facilitated the substitution of certain individual lenders to new lenders who wished to earn interest from the Debtor.'" (*Id.*; (citing Second Nour Decl. at ¶ 6).) Additionally, the relevant general ledger reflected that certain loans were substituted. (*E.g.*, ECF No. 93 at 217–18; ECF No. 83 at 15–166.) This evidence cumulatively supports the Bankruptcy Court's finding that sufficient evidence established the substitution of funds used to acquire the Property and thus it was proper for Neches to include such substitute funds in the balance owed on Lenders' Promissory Note. (ECF No. 73 at 216.)

Finally, BB&T and Commonwealth maintain that the substituting of funds from later-in-time "investors" to pay off first-in-time "investors" amounts to a Ponzi scheme and the Bankruptcy Court erred in concluding otherwise. (ECF No. 63 at 40, 43; ECF No. 59 at 20–21; *see* ECF No. 73 at 216–17 n.34.) Lenders argues that BB&T and Commonwealth

19

can produce no evidence to support such a claim. (*E.g.*, ECF No. 47 at 56.) This Court agrees with the Bankruptcy Court.

A Ponzi scheme is:

> An arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit-making business opportunity exists, where in fact no such opportunity exists.

*In re Agric. Research & Tech. Grp., Inc.*, 916 F.2d 528, 531 (9th Cir. 1990). The Ninth Circuit has also characterized a Ponzi scheme as "a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors with the goal of attracting more investors." *In re Slatkin*, 525 F.3d 805, 809 n.1 (9th Cir. 2008). "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture[.]" *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (emphasis added).

Here, there is simply no evidence that the first-in-time-lenders received the repayment of their loan from Lenders in the guise of profits or that the repayment of such loans resulted in "artificially high" returns. In short, there is no evidence to support a conclusion that the Bankruptcy Court erred in finding the absence of a Ponzi scheme.[15]

### C.    Allowing Recovery for Substitute Lenders

As an extension of their Ponzi scheme theory, BB&T and Commonwealth insist that the inclusion of later funds into the balance owed improperly rewards "substitute lenders" for participating in such a scheme and thus the inclusion of such funds was in error. (ECF No. 63 at 44.) Because the Court concurs that BB&T and Commonwealth fail to establish

///

---

[15]The Bankruptcy Court also noted that BB&T and Commonwealth never raised the existence of a Ponzi scheme in either the adversary complaint or in BB&T's Objection to POC 12, nor did BB&T serve notice of its Objection to POC 12 on all of Rose's creditors or the individual lenders, and additionally found that the Ponzi scheme allegation was procedurally defective ("too late"). (ECF No. 73 at 217 n.34.) The Court does not address the timeliness issue because Lenders does not argue it here and because the Court finds the Bankruptcy Court's consideration of the merits of the claim is sound standing alone.

that such a scheme exists here, the Court concludes that the Bankruptcy Court did not commit error—that its decision will result in recovery by the "substitute lenders."

In sum, the Court affirms the Bankruptcy Court's Judgment and Order from which BB&T and Commonwealth appeal.

## VI. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the consolidated appeals.

It is therefore ordered that the Bankruptcy Court's Order in bankruptcy case no. 11-14974-MKN and Judgment in adversary proceeding no. 13-01822 are affirmed.

The Clerk of Court is directed to enter judgment accordingly in the consolidated appeals (2:17-cv-01251-MMD, 2:17-cv-1298-MMD, and 2:17-cv-1301-MMD) and close these cases.

DATED THIS 30th day of September 2019.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE